UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————

№ 12-cv-3049(JFB)(GRB)

———————————————

SHEET METAL WORKERS NATIONAL PENSION FUND, ET AL.,

Plaintiffs,

VERSUS

STEVEN EVANS II AS AN INDIVIDUAL
DOING BUSINESS AS SE MECHANICAL A.K.A. STEVE MECH,

Defendant.

———————————————

**MEMORANDUM AND ORDER**
June 11, 2014

———————————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs bring this action against *pro se* defendant Steven Evans II, under Section 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1145, to recover delinquent contributions to plaintiffs' ERISA-regulated funds. Plaintiffs are owed the contributions under the clear terms of a collective bargaining agreement between defendant and a local union, and previously in this litigation, the Court granted summary judgment to plaintiffs for contributions owed from April 1, 2009, to July 31, 2009. The present motion for summary judgment concerns damages. Plaintiffs have submitted documentation of the missed contributions based on defendant's own reports, showing the amount of the required payments themselves, as well as plaintiffs' calculation of the interest, liquidated damages, and reasonable attorneys' fees and costs. Although defendant does not dispute that he owes some amount for the delinquent contributions, he argues that these amounts are excessive and that the local union is to blame for his failure to pay the national funds.

As set forth below, the Court concludes that defendant is liable for the delinquent contributions as well as interest, liquidated damages, and reasonable attorney's fees, because the collective bargaining agreement obligated him to make those contributions and Congress intended to limit an employer's defenses to actions under ERISA § 515. The conduct of the local union cited by defendant does not relate to one of the permissible defenses, and it does not alter the terms of the collective bargaining agreement. Accordingly, plaintiffs' motion for summary judgment on damages is granted, although for the reasons discussed below, the Court reduces the requested amount of attorneys' fees and will require

plaintiffs to submit additional documentation in order to recover costs.

I. BACKGROUND

Defendant is the sole proprietor and owner of SE Mechanical, an employer within the meaning of Section 3(5) of ERISA, 29 U.S.C. §1002(5). (Mem. Und. dtd. July 14, 2008; Def. Ans. at 1.)[1] In that capacity, he signed two Memoranda of Understanding with the President of Local Union 28 ("Local 28") of the Sheet Metal Workers' International Association, which obligated him to make the contributions at issue in this case.

A. The Agreements between Defendant and Local 28

The two memoranda bound defendant to a Collective Bargaining Agreement ("CBA") which Local 28 had previously reached with two groups representing sheet-metal industry employers. (*See* Mem. Und. dtd. July 14, 2008; Mem. Und. dtd. Aug. 2, 2010.) Each memorandum was only one page long and explicitly incorporated the CBA. The exact language of the July 14, 2008 memorandum is as follows:

> The terms, conditions and revisions of the Collective Bargaining Agreement . . . effective August 1, 2005 through July 31, 2009, shall constitute the Collective Bargaining Agreement by and between the UNION and [defendant], covering the EMPLOYEES for the period from the date of the execution of this MEMORANDUM to July 31, 2009.

Thus, as is apparent from the face of the memorandum, defendant was bound to the CBA from July 14, 2008 (the date of execution of the memorandum) until the lapse of both the memorandum and the CBA on the same day: July 31, 2009. Defendant did not sign another memorandum until August 2, 2010, leaving a one-year gap between the lapse of the first memorandum and the signing of the second. This gap and its effect on this litigation will be discussed in more detail below. For background purposes, it suffices to note that the relevant portion of the second memorandum is identical to the first, except that it incorporated a second CBA effective from August 1, 2009 until July 31, 2011, and the memorandum itself also lapsed on July 31, 2011. The second memorandum and second CBA are not directly at issue on this motion, because defendant did not become bound to them until after the period in 2009 for which the Court has already granted summary judgment.

The CBA incorporated by the first memorandum was effective from August 1, 2005 until July 31, 2009, and it obligated defendant to make regular contributions to three national welfare funds: the Sheet Metal Workers National Pension Fund (*see* Ex. A to Shaw Decl. § 21); the National Stabilization Agreement for the Sheet Metal Industry (*id.* § 22); and the International

---

[1] In an abundance of caution, the Court has relied on *pro se* defendant's Answer as well as his submissions in opposition to the motion for summary judgment, in order to determine which facts are undisputed. He has not submitted a statement under Local Rule 56.1, or any affidavits, despite having been served twice with the "Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment" form, which describes the requirements of submitting evidence and raising specific facts. The Court also notes that both parties have attached identical copies of the memoranda of understanding cited herein.

Training Institute (*id.* § 23).² Defendant's regular contributions to these funds were defined in the CBA in specific dollar amounts for each hour paid to all employees.

The CBA also incorporated a third set of documents into the agreement between plaintiffs and defendant: the "Declaration[] of Trust governing the various National Benefit Funds." (*Id.* § 24(A).) These declarations provide that if an employer fails to make the required contributions, the employer will be liable to the fund for interest, liquidated damages (20% of the delinquent contributions), and reasonable attorneys' fees and costs. (Ex. G to Shaw Decl. at 19; Ex. H at 14-15; Ex. I at Art. VII § 8; Ex. J at 21-22; Ex. K at 22.) Thus, the declarations provide for the maximum remedy allowed under ERISA § 502, 29 U.S.C. § 1132(g)(2).³

---

² The CBA states that the International Training Institute encompasses two other funds, and therefore plaintiffs have presented billing records showing the amount owed to five funds, rather than three.

³ That section provides:

> In any action under this subchapter by a fiduciary for or on behalf of a plan to [collect delinquent contributions] in which a judgment in favor of the plan is awarded, the court shall award the plan—
>
> (A) the unpaid contributions,
>
> (B) interest on the unpaid contributions,
>
> (C) an amount equal to the greater of—
>
> (i) interest on the unpaid contributions, or
> (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

### B. The Elkins Email

Defendant does not question the validity of the memoranda or the incorporated documents. Instead, he argues that Local 28 is to blame for his missed contributions. In doing so, defendant relies on an email sent by Debbie Elkins, an NPF official. On December 21, 2010, Elkins stated in an email to a Local 28 official that "[w]e believe that SE Mechanical is signed to the Light Commercial Agreement which **does not require any** National Benefit Funds." (Def. Mem. Opp. at 4. (emphasis in original).) She further stated that NPF did not receive a letter from Local 28 establishing SE Mechanical as an NPF-contributing employer, and that SE Mechanical had never been billed for any NPF contributions. (*Id.*)

According to defendant, the Elkins email was prompted by his own efforts in November 2010 to contact the national funds, because one of his employees informed him that his national fund contributions had not been received by the NPF. (Def. Mem. Opp. ¶¶ 3-4.) Although defendant suggests that he "made an attempt to pay (those outstanding bills) with the NPF" (*id.* ¶ 6), he does not specify the efforts he made, nor does he dispute that the contributions for April 1, 2009 to July 31, 2009, remain unpaid.

### C. The Delinquent Contributions

Plaintiffs' first summary judgment motion claimed that defendant was liable for

---

> (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
>
> (E) such other legal or equitable relief as the court deems appropriate.

3

delinquent contributions from April 1, 2009 through April 30, 2010. (Pl. Mot.(1) at 7.) However, that period was over-inclusive in light of the effective dates of the two memoranda of understanding: the first memorandum lapsed on July 31, 2009. Thus, with respect to the period from August 1, 2009, to April 30, 2010—the majority of the period for which plaintiffs sought delinquent contributions—there was a genuine issue for trial concerning whether defendant had any agreement with Local 28 and was subject to the CBA. Therefore, the Court granted summary judgment only with respect to the period from April 1, 2009 to July 31, 2009,[4] and defendant did not dispute whether he was delinquent during that time.

When the Court granted partial summary judgment, it afforded the parties additional time to attempt to settle the issue of damages. The parties were unable to do so, and instead they briefed the present summary judgment motion related to damages for the period from April 1, 2009, to July 31, 2009.

D. Procedural History

Plaintiffs first filed suit in this action on June 19, 2012. On January 24, 2014, in a detailed ruling on the record, the Court granted in part and denied in part plaintiffs' first motion for summary judgment. On March 21, 2014, plaintiffs filed a second summary judgment motion on the damages issue. Defendant responded in opposition on April 21, 2014, and plaintiffs replied on April 30, 2014.

II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

---

[4] The Court denied summary judgment with respect to the broader period for which plaintiffs sought damages, but noted that there could be an issue for trial regarding that broader period. The Court will schedule a telephone conference to discuss whether plaintiffs intend to continue pursuing that portion of their claim.

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

When considering a dispositive motion made by or against a *pro se* litigant, the Court is "mindful that a *pro se* party's pleadings must be 'liberally construed' in favor of that party and are held to 'less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). The Second Circuit "liberally construe[s] pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (internal quotation marks and citations omitted). Nonetheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (internal quotation marks and citation omitted).

III. DISCUSSION

As noted, the Court previously granted summary judgment to plaintiffs for contributions covering the period from April 1, 2009 to July 31, 2009. Before addressing the damages issue, the Court must consider defendant's personal liability as an ERISA fiduciary. Defendant has not challenged that designation, but because of his *pro se* status, the Court will discuss whether plaintiff may be sued in his personal capacity.

A. Defendant's Personal Liability

The Second Circuit recently explained the legal backdrop for personal-capacity suits against employers to recover delinquent contributions:

> Pursuant to 29 U.S.C. § 1145 . . . where an employer has entered into a collective bargaining agreement requiring him to remit funds to an ERISA plan, the employer is obligated to "make such contributions in accordance with the terms and conditions of [the collective bargaining] agreement." If an employer fails to make

5

required contributions, a fiduciary of the plan may sue the employer, or another fiduciary of the plan, as that term is defined under ERISA, to recover the unpaid contributions. *See* 29 U.S.C. §§ 1132, 1109; . . . . In turn, ERISA provides alternative definitions of "fiduciary." For example, ERISA provides that a fiduciary is someone who "exercises any discretionary authority or discretionary control respecting management of [an ERISA benefit] plan *or* exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i).

*Finkel v. Romanowicz*, 577 F.3d 79, 85 (2d Cir. 2009) (emphasis in original).

An employer—as an individual—may meet the definition of an ERISA fiduciary if the contributions he is obligated to pay are considered assets of the ERISA plan, and not merely debts owed by the employer. "While unpaid employer contributions are not ordinarily assets of the plan, the parties to an agreement are free to provide otherwise." *Trs. of the Road Carriers Local 707 Welfare Fund v. Goldberg*, No. 08-CV-0884 (RRM)(MDG), 2009 WL 3497493, at *3 (E.D.N.Y. Oct. 28, 2009) (citing *In re Halpin*, 566 F.3d 286, 290-91 (2d Cir. 2009)).

Here, the CBA states that contributions "due and owing" are "considered assets of the respective Funds." (Ex. B to Shaw Decl. § 19(B).) Therefore, it is possible for defendant to meet the definition of an ERISA fiduciary. *Cf. Trs. of the Plumbers Local Union No. 1 Welfare Fund v. Manhattan Plumbing Corp.*, No. 08-CV-3036 (FB)(RML), 2010 WL 456870, at *2 (E.D.N.Y. Feb. 3, 2010) (noting "the plain language of the trust declarations defining 'assets' to include contributions due and owing"); *Goldberg*, 2009 WL 3497493 at *3 ("The Trust Agreement states, in pertinent part, that the Trust created 'shall comprise of assets derived from all Employer contributions received *and to be received* for the purposes of this Trust pursuant to Collective Bargaining Agreements[.]' . . . . Thus, all employer contributions owed by Avet to the Fund constitute assets of the Fund whether or not they were actually paid to the Fund.").

Whether defendant meets the definition of an ERISA fiduciary is "to be broadly construed," *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997), but it is not met simply because a defendant is the officer of an ERISA employer. In *LoPresti*, for example, where two brothers were the sole shareholders and officers of an ERISA employer, the Second Circuit held that one brother was a fiduciary and the other was not. *Id.* at 40-41. Both brothers were aware of the obligation to make deductions from employees' wages, and both had the authority to sign checks. Only one brother, however, had the authority to "determin[e] which bills to pay, in that he decided which creditors were to be paid out of the Company's general account (which, during the relevant time frame, included employee Fund contributions), and when those creditors were to be paid." *Id.* at 40. Only that brother was held personally liable as an ERISA fiduciary who "exercises any authority or control respecting management or disposition of [an ERISA plan's] assets." 29 U.S.C. § 1002(21)(A)(i); *see also Romanowicz*, 577 F.3d at 86-87 ("The Joint Board has not alleged that Romanowicz select[ed] investments or exchang[ed] one instrument for another. . . . Nor has it alleged that he was responsibl[e] for determining which of the company's

6

creditors would be paid or in what order." (internal quotation marks and citations omitted)).

Here, defendant's admissions that he is the sole proprietor of SE Mechanical, and that he had authority over the ERISA plan assets he failed to contribute to plaintiffs, qualify him as an ERISA fiduciary. Like the fiduciary brother in *LoPresti*, defendant admits his responsibility for paying SE Mechanical's bills. (Def. Answer at 2 ("This was the first time I, owner of SE Mechanical heard of these benefits. Upon hearing the claim, I, Steven Evans II, immediately proceeded to contact the National Pension Fund, to completely pay what was owed."); Def. Mem. Opp. ¶¶ 3-6.) In addition, defendant attached two documents to his answer which provide further proof of his authority of ERISA assets. One is a "Notice and Demand for Payment of Tax Due" from the New York State Department of Taxation and Finance, addressed to defendant by name, at SE Mechanical's address, obligating him to pay SE Mechanical's taxes. The second is a "Sole Proprietor Certification" defendant signed for New York Commercial Bank, which reflects that he was the only person authorized to sign checks and perform other banking transactions on behalf of SE Mechanical. Combined with defendant's failure to dispute his authority or identify any fact suggesting that he is not a fiduciary, these facts demonstrate that defendant exercises control over ERISA plan assets and may be held personally liable. *Cf. Sheet Metal Workers' Nat'l Pension Fund v. AUL Sheet Metal Works Inc.*, No. 10 Civ. 1371(KBF), 2012 WL 32237, at *5 (S.D.N.Y. Jan. 5, 2012) ("[T]he facts that defendant Jerome conceded at his deposition—that during the relevant period he was the sole officer, director and shareholder of AUL, maintained AUL's business records and made all of the payment decisions on behalf of AUL, including regarding payment to the Benefit Funds—are more than sufficient to demonstrate that he exercised discretionary authority respecting management or disposition of the Fund assets.").

B. Liability under the CBA

Defendant's argument in opposition to plaintiff's motion is that Local 28 is to blame for his missed payments, but the unambiguous terms of the CBA—the validity of which defendant does not dispute—obligate defendant to pay the delinquent contributions to plaintiffs. The CBA does not impose any responsibility on Local 28 to ensure that defendant made these payments.[5]

Defendant's argument, which focuses not on the conduct of plaintiffs, but on Local 28, is strikingly similar to an argument rejected by the Second Circuit in *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310 (2d Cir. 1990). There, an employer, defending a claim for delinquent

---

[5] Although defendant contends that he was never billed for the national-fund contributions, neither he nor the Court has identified any authority suggesting that this erases his liability to plaintiffs under the CBA. Furthermore, the Elkins email demonstrates that defendant was aware of an issue concerning the contributions as early as December 2010. Plaintiffs did not file suit in this action until June 19, 2012. Thus, even considering in a light most favorable to defendant the fact that there could have been an omission by Local 28 or the national funds, defendant had ample time before the suit was filed to make his contributions. Had defendant done so with respect to any portion of the delinquency, he would have avoided liability for interest and liquidated damages on that portion. *See Iron Workers Dist. Council of W.N.Y. & Vicinity Welfare & Pension Funds v. Hudson Steel Fabricators & Erectors, Inc.*, 68 F.3d 1502, 1506-08 (2d Cir. 1995).

7

contributions brought by a national fund, argued that the collective bargaining agreement obligating him to make the national-fund payments had been abandoned by the local union. *Id.* at 311. In particular, defendant alleged that the local union had acquiesced in his non-compliance with several terms of the agreement. *Id.* at 311-12. The Second Circuit rejected that argument because the history of ERISA's section 515 showed that it was enacted to "permit trustees of plans to recover delinquent contributions efficaciously." *Id.* at 314 (quoting 126 Cong. Rec. 23,039 (1980)); *see also King v. Plan It Const. & Equip. Co.*, 179 F. Supp. 2d 71, 74 (E.D.N.Y. 2002) ("Congress enacted Section 515 to simplify actions to collect delinquent contributions, avoid costly litigation, and enhance the actuarial planning necessary to the administration of multiemployer pension plans.") (internal quotation marks and citations omitted).

In keeping with Congress's purpose, an employer's available defenses to an action under § 515 are extremely limited.

> For example, an employer may not assert that the union orally agreed not to enforce the terms of the collective bargaining agreement, . . . that the employer was fraudulently induced to enter into the agreement, . . . or that no contract was formed because of unilateral or mutual mistake of fact. . . . Our research has disclosed only two defenses recognized by the courts: (1) that the pension contributions themselves are illegal, . . . and (2) that the collective bargaining agreement is void (not merely voidable). . . . Thus, once an employer knowingly signs an agreement that requires him to contribute to an employee benefit plan, he may not escape his obligation by raising defenses that call into question the union's ability to enforce the contract as a whole.

*Benson*, 907 F.2d at 314; *see also Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 470-71 (1960) (holding that a union's breach of collective bargaining agreement does not relieve employer of obligation to contribute to welfare fund, unless agreement provides for such a defense in "unequivocal words"); *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997) ("In this respect, section 515 puts multiemployer plans in a stronger position than they otherwise occupy under common law contract principles.").

Here, defendant has not identified any facts suggesting that either of the two permitted defenses are met; he has not argued or even suggested that the required contributions are illegal or that the CBA is void. Therefore, the Court must enforce the unambiguous terms of the CBA, which make defendant liable to plaintiffs for the delinquent contributions, regardless of any alleged failure by Local 28. *See Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 138 (3d Cir. 1993) ("To prevent union corruption and protect employee expectations, multiemployer funds are immune from many contract defenses that would bar unions from enforcing a collective bargaining agreement. . . . The special status of multiemployer funds allows them to rely on the unambiguous written agreements presented to them.") (citing *Benson*, 907 F.2d at 313-14); *see also Tr. of Local 813 Ins. Tr. Fund v. Wilner's Livery Serv., Inc.*, No. 11-CV-3180 (DLI)(CLP), 2012 WL

4327070, at *3 (E.D.N.Y. Sept. 19, 2012) ("[A]s *Benson* confirms, courts have rejected defenses such as a union's oral agreement not to enforce the terms of the collective bargaining agreement, lack of mutual assent, or unilateral or mutual mistake of fact.").

Although defendant "is…[not] permitted to raise defenses that relate to claims the employer may have against the union," *Ralph's Grocery*, 118 F.3d at 1021, the Court takes no position on any claim against Local 28 in separate litigation. Defendant has not attempted to join Local 28 in this action, but the Court has considered this issue because of defendant's *pro se* status. For the same reason that defenses are limited under § 515, it is not necessary to join Local 28 in this action and further complicate plaintiffs' efforts to recover the delinquent funds. *See Sw. Admins., Inc. v. Rozay's Transfer*, 791 F.2d 769, 777 (9th Cir. 1986) ("It is not an abuse of discretion to deny an application for impleader where it will disadvantage the existing action. The district court reasonably concluded that impleading the union would be inconsistent with the purposes of ERISA in providing a streamlined and simplified procedure for employee benefit trust funds to collect delinquent contributions."); *Nat'l Elec. Ben. Fund v. Heary Bros. Lightning Protection Co., Inc.*, 931 F. Supp. 169, 183 (W.D.N.Y. 1995) (severing employer's third-party claim against union because "[t]o further delay collection of the delinquent contributions would prejudice NEBF by depriving it of the ability to utilize those amounts for the benefit of plan participants" and holding that "[t]his prejudice to NEBF would not be outweighed by the [employers'] legal obligation to contribute to the funds"); *Laborers Dist. Council Pension & Disability Tr. Fund No. 2 v. Geofreeze, Inc.*, Civil No. JKB-12-2583, 2014 WL 960803, at *4 (D. Md. Mar. 11, 2014) ("[T]he special nature of this kind of ERISA case should be taken into account when considering the appropriateness of a third-party complaint.").

C. Damages

Plaintiffs have submitted documentary evidence, based on defendant's own reports to plaintiffs' billing department, showing that defendant owes $4,822.30 in delinquent contributions, $2,277.80 in interest, and $964.39 in liquidated damages, for a total of $8,064.49. (Shaw Decl. ¶¶ 13-14, 22-27 Exs. D and F to Shaw Decl.[6]) Although defendant suggests that these figures are excessive, he has not disputed whether the calculations are correct, and he certainly has not "come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola*, 298 F.3d at 160 (quotation marks and citation omitted, emphasis in original). He also has not suggested that these figures are inconsistent with his obligation under the CBA and the declarations of trust, or under ERISA section 502, 29 U.S.C. § 1132(g)(2). *See also Benson v. Brower's Moving & Storage, Inc.*, 726 F. Supp. 31, 36 (E.D.N.Y. 1989) ("There is no question that Section 502(g)'s remedies are *mandatory,* and entirely consistent with the purposes of Section 515

---

[6] The Court notes an inconsistency between the Shaw Declaration and two of its exhibits. The declaration itself and Exhibit D state that the amount of interest owed is $2,277.80. This same amount is reflected in the amounts of interest accrued to the individual funds, as shown in "Schedule of Past Contributions" in Exhibit C. However, Exhibit F states without explanation that the amount of interest owed is $2,434.94, and plaintiffs cite this figure elsewhere in their papers without identifying any additional evidence of it. Therefore, the Court concludes that the documentary evidence supports interest in the amount of $2,277.80, which results in a total damages award of $8,064.49.

9

discussed above." (citing *Laborers Health & Welfare Trust Fund for N. Calif. v. Adv. Lightweight Concrete Co., Inc.*, 484 U.S. 539, 547 (1988) ("Congress added these . . . strict remedies to give employers a strong incentive to honor their contractual obligations to contribute and to facilitate the collection of delinquent accounts."))). Accordingly, the Court grants summary judgment to plaintiff in the amount of $8,064.49.

D. Reasonable Attorney's Fees

Both the declarations of trust and ERISA § 502 entitle plaintiffs to reasonable attorney's fees. Generally, to determine a reasonable attorney's fee, a court must calculate a "lodestar figure," which is determined by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see also Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997). "Both [the Second Circuit] and the Supreme Court have held that the lodestar . . . creates a 'presumptively reasonable fee.'" *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Assoc. v. Cnty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2008); citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010)). "'[T]he lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee' . . . ." *Perdue*, 559 U.S. at 553 (quoting *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565-66 (1986)). Thus, the Supreme Court has recognized that "the lodestar method produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Id.* at 551. "The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed." *Hugee v. Kimso Apartments, LLC*, 852 F. Supp. 2d 281, 298 (E.D.N.Y. 2012) (citing *Hensley*, 461 U.S. at 433).

1. Reasonable Hourly Rate

"The reasonable hourly rate is the rate a paying client would be willing to pay." *Arbor Hill*, 522 F.3d at 190. The Second Circuit's "'forum rule' generally requires use of 'the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee.'" *Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 290 (2d Cir. 2011) (quoting *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009)). In *Arbor Hill*, the Second Circuit also instructed district courts to consider the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 92-93 (1989). *See* 522 F.3d at 190.

> The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and

length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 186 n.3 (quoting *Johnson*, 488 F.2d at 717-19). Finally, a district court should also consider "that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively," and "that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case." *Id.* at 190. "The burden rests with the prevailing party to justify the reasonableness of the requested rate," and plaintiff's attorney "should 'establish his hourly rate with satisfactory evidence—in addition to the attorney's own affidavits." *Hugee*, 852 F. Supp. 2d at 298.

"Courts have awarded rates of $200 to $400 per hour for partners in this district." *Capone v. Patchogue-Medford Union Free Sch. Dist.*, No. 04-CV-2947 (JS)(MLO), 2011 WL 743573, at *2 (E.D.N.Y. Feb. 23, 2011); *see also United States v. Jones*, No. 11-CV-2869 (JFB), 2013 WL 6408639, at *3 (E.D.N.Y. Dec. 9, 2013) (noting that "recent Eastern District cases have indicated that the range of appropriate billing rates in this District is $200-$375 for partners"). Of course, in light of the numerous factors that courts in this circuit consider to determine a reasonable hourly rate, "the range of 'reasonable' attorney fee rates in this district varies depending on the type of case, the nature of the litigation, the size of the firm, and the expertise of its attorneys." *Siracuse v. Program for the Dev. of Human Potential*, No. 07-CV-2205 (CLP), 2012 WL 1624291, at *30 (E.D.N.Y. Apr. 30, 2012).

Here, plaintiffs' lead counsel Jeffrey Dubin requests a rate of $300 per hour. In support of this request, he has submitted a declaration stating that he has been admitted to practice law in New York for more than 45 years, and in this district for more than 40 years. (Dubin Decl. ¶ 22.) He has spent his entire career practicing labor relations and employee benefits law. (*Id.* ¶ 23.) For a partner of Dubin's experience level, in a *pro se* case involving uncomplicated issues, $300.00 is a reasonable rate.

Dubin also requests rates of $175.00 and $225.00 for his two associates. However, he provided no information concerning their experience level, or how the *Johnson* factors apply to the work performed by the associates. Accordingly, in the absence of this required information, the Court concludes that $100.00 is a reasonable rate for the work performed by the two associates. *See Nicholson v. Williams*, No. 00 CV 2229 JBW, 2004 WL 4780498, at *5 n.10 (E.D.N.Y. Apr. 5, 2004) (reducing attorneys' hourly rates where they submitted no evidence of their experience); *Marathon Ashland Petroleum LLC v. Equilli Co., L.P.*, No. 00 Civ. 2935 JSMKNF, 2003 WL 21355216, at *1 (S.D.N.Y. June 10, 2003); *see also Pall Corp. v. 3M Purification Inc.*, Nos. CV 97-7599(RRM)(ETB), CV 03-0092(RRM)(ETB), 2012 WL 1979297, at *4 (E.D.N.Y. June 1, 2012) (noting "[r]ecent opinions issued by courts within the Eastern District of New York have found reasonable hourly rates to be approximately . . . $100-200 for junior associates").

2. Reasonable Hours

Having determined reasonable hourly rates for Dubin and his associates, the Court must determine the reasonable number of hours expended by them in this litigation.

"The party seeking attorney's fees also bears the burden of establishing that the number of hours for which compensation is sought is reasonable." *Custodio v. Am. Chain Link & Const., Inc.*, No. 06-CV-7148

11

(GBD), 2014 WL 116147, at *9 (S.D.N.Y. Jan. 13, 2014) (citing *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994)). "Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Kirsch*, 148 F.3d at 173. "Hours that are 'excessive, redundant, or otherwise unnecessary,' are to be excluded, and in dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application.'" *Id.* (quoting *Hensley*, 461 U.S. at 434; *N.Y. Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983)); *see also Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) ("We do not require that the court set forth item-by-item findings concerning what may be countless objections to individual billing items."). For example, in *Matusick v. Erie County Water Authority*, the Second Circuit upheld a district court's fifty percent across-the-board reduction in hours in light of "concerns regarding unspecified conferences, telephone calls, email correspondence, and reviews." --- F.3d ---, Nos. 11-1234, 11-1618, 2014 WL 700718, at *26–27 (2d Cir. Feb. 25, 2014) (internal quotation marks and citations omitted); *see also Francois v. Mazer*, 523 F. App'x 28, 29 (2d Cir. 2013) (upholding forty percent across-the-board reduction in hours); *Green v. City of New York*, 403 F. App'x 626, 630 (2d Cir. 2010) (upholding fifteen percent across-the-board reduction); *Kirsch*, 148 F.3d at 173 (upholding "20% reduction for vagueness, inconsistencies, and other deficiencies in the billing records").

Here, as in *Kirsch*, the Court will apply a 20% reduction for "vagueness, inconsistencies, and other deficiencies in the billing records." 148 F.3d at 173. In particular, although the Court is not required to set forth item-by-item findings, Dubin's practice of billing .4 hours for tasks including the review of one-sentence docket entries and the submission of one-paragraph correspondence indicates possible overbilling. (*See* Dubin Decl. at 8-9.) Other examples include an entire hour recorded for the purpose of submitting a one-page request for an adjournment; 9.5 hours to prepare the second summary judgment motion in this case, which was limited in scope to the narrow question of damages; and three hours to appear for an oral argument which lasted 28 minutes. *Cf. Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, No. 09-CV-5251 (JFB)(AKT); 2014 WL 1514235, at *16 (E.D.N.Y. Apr. 16, 2014) ("The Court has considered the possibility that Blangiardo included his travel time to and from the courthouse in the foregoing billing entries. Even if this were true, the Court would reduce the amount of Blangiardo's fee by fifty percent for travel time." (citations omitted)). Accordingly, the Court will apply a 20% across-the-board reduction.

The Court calculates the lodestar figure in this case to be $9,320.00, which is the product of 20.96 hours worked by Dubin at a rate of $300.00, and 30.32 hours worked by his associates at a rate of $100.00.[7] The Court sees no reason to depart from this lodestar figure in this case, *see, e.g.*, *Perdue*, 559 U.S. at 553 (noting that lodestar figure includes "most, if not all," relevant factors in setting reasonable attorney's fee), and thus awards plaintiff $9,320.00 in attorneys' fees.

---

[7] These hourly figures are the product of 20% reductions from the requested amounts of 26.2 hours (Dubin) and 37.9 hours (the associates). (*See* Dubin Decl. at 11.)

### E. Reasonable Costs

The declarations of trust and ERISA § 502 also entitle plaintiffs to reasonable costs. "As for costs, a court will generally award 'those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.'" *Pennacchio v. Powers*, No. 05-CV-985 (RRM)(RML), 2011 WL 2945825, at *2 (E.D.N.Y. July 21, 2011) (quoting *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998)). "The fee applicant bears the burden of adequately documenting and itemizing the costs requested." *Id.*; *see also First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, No. 10-CV-696 (KAM)(SMG), 2013 WL 950573, at *10 (E.D.N.Y. Mar. 12, 2013). In particular, under Local Civil Rule 54.1, "the party must include as part of the request an affidavit that the costs claimed are allowable by law, are correctly stated and were necessarily incurred, and [b]ills for the costs claimed must be attached as exhibits." *D.J. ex rel. Roberts v. City of New York*, No. 11-CV-5458 (JGK)(DF), 2012 WL 5431034, at *9 (S.D.N.Y. Oct. 16, 2012) (internal quotation marks and citations omitted), *report & recommendation adopted sub nom. Roberts v. City of New York*, 2012 WL 5429521 (S.D.N.Y. Nov. 7, 2012).

Here, plaintiffs have itemized costs of $693.69, which includes the court filing fee, service expenses, and postage. However, plaintiffs have not submitted any supporting documentation related to costs. Although the Court could deny plaintiff's request for costs on this basis, *see, e.g.*, *De Alvarez v. City of New York*, No. 10-CV-4434 (SJ)(LB), 2012 WL 2087761, at *3 (E.D.N.Y. May 16, 2012), *report & recommendation adopted sub nom. Alvarez v. City of New York*, 2012 WL 2087759 (E.D.N.Y. June 8, 2012), in this case, the Court will allow plaintiffs to submit supporting documentation for these costs.

### IV. CONCLUSION

Plaintiffs' motion for summary judgment concerning damages for the period from April 1, 2009 to July 31, 2009, is granted, because the CBA unambiguously obligated defendant to make contributions during that period, and he failed to do so. Plaintiffs are awarded $8,064.49 in delinquent contributions, interest, and liquidated damages, and $9,320.00 in attorney's fees. By separate order, the Court will schedule a telephone conference in order to discuss plaintiffs' submission of additional documentation related to costs, and whether plaintiffs intend to continue pursuing a claim for the time period beyond July 31, 2009.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: June 11, 2014
       Central Islip, NY

\*\*\*

Plaintiffs are represented by Jeffrey S. Dubin, Amy E. Lucas-Strang, and Doreen Nanda, 464 New York Avenue, Suite 100, Huntington, NY 11743. Defendant is *pro se*.